UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHARLES E. GRIFFIN, II,<br><br>Plaintiff,<br><br>v.<br><br>DOROTHY DO-WILLIAMS, et al.,<br><br>Defendants. | No. 2:16-cv-01435 WBS CKD P<br><br>ORDER AND<br><br>FINDINGS AND RECOMMENDATIONS |

Plaintiff is a California prisoner proceeding pro se with an action for violation of civil rights under 42 U.S.C. § 1983. During the relevant period, July 2015 and January 2016, plaintiff was housed at the California Health Care Facility (CHCF) in Stockton. Defendant Dr. Do-Williams was plaintiff's primary care physician, defendant Dr. Williams was the Physical Medicine and Rehabilitation Specialist, defendant Dr. Malakkla was the Chief Physician, defendant Dr. Adams was the Chief Medical Executive, and defendant Saipher was a Certified Nurse Practitioner.

The operative complaint is plaintiff's second amended complaint filed May 26, 2017. The claims which remain arise under the Eighth Amendment for denial of constitutionally adequate medical care with respect to arthritis, hip damage, spine damage and chronic pain arising therefrom. The claims are based upon allegations made in paragraphs 23-24 and 29 of the second

/////

1

amended complaint. ECF No. 37 & 43. Defendants' motion for summary judgment (ECF No. 61) is before the court.

I. <u>Summary Judgment Standard</u>

Summary judgment is appropriate when it is demonstrated that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party asserting that a fact cannot be disputed must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials. . ." Fed. R. Civ. P. 56(c)(1)(A).

Summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." <u>Id.</u>

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. <u>See</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of their pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists or show that the materials cited by the movant do not establish the absence of a genuine dispute. <u>See</u> Fed. R. Civ. P. 56(c); <u>Matsushita</u>, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n</u>, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is

/////

genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the evidence of the opposing party is to be believed. See Anderson, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Matsushita, 475 U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

II. Medical Care Under the Eighth Amendment

Under the Eighth Amendment, prisoners cannot be subjected to "cruel and unusual punishment[]." Denial or delay of medical care for a prisoner's serious medical needs may constitute a violation of the prisoner's Eighth Amendment rights. Estelle v. Gamble, 429 U.S. 97, 104-05 (1976). An individual is liable for such a violation only when the individual is at least deliberately indifferent to a prisoner's serious medical needs. Id.

For there to be deliberate indifference under this standard, a prison official must not only "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but that official "must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837

(1994). A difference of opinion about the proper course of treatment is not deliberate indifference. See, e.g., Toguchi v. Chung, 391 F.3d 1051, 1058 (9th Cir. 2004). For a prisoner to prevail on a claim involving choices between alternative courses of treatment, he must show that the chosen course of treatment was "medically unacceptable under the circumstances" and was chosen "in conscious disregard of an excessive risk to the prisoner's health." Id. at 1058.

III. Arguments and Analysis

Defendants argue that with respect to plaintiff's remaining claims, there is no genuine issue of material fact as to whether any defendant was ever at least deliberately indifferent to any of plaintiff's serious medical needs. For the reasons indicated below, the court agrees.

A. Initial Visits with Dr. Do-Williams

Paragraph 23 of plaintiff's second amended complaint concerns plaintiff's first two visits, on July 1 and 7, 2015, with defendant Dr. Do-Williams. The visits occurred shortly after plaintiff arrived at CHCF and were conducted via video conference. In her affidavit, Dr. Do-Williams describes her meetings with plaintiff on these dates as follows:[1]

> Plaintiff had recently transferred from [R.J. Donovan Correctional Center] to CHCF and was receiving fifteen milligrams of morphine twice a day for his osteoarthritis. Plaintiff had a history of polysubstance dependence, and his previous PCP [primary care provider] had a plan to taper him off morphine because Plaintiff continued to request increasingly higher dosages. I did not recommend increasing Plaintiff's morphine during the above encounters because, in my opinion, opioids are not an appropriate treatment for chronic pain management. In particular, continued opioid use will result in the patient developing a tolerance to opioids. Opioid tolerance occurs when an individual needs greater amounts of a drug in order to achieve its therapeutic effect. Continuing to increase the amount of opioids a patient is prescribed increases the risk of serious complications. Plaintiff was particularly susceptible to this because of his history of polysubstance dependence. Plaintiff also declined to discuss his pain in detail. I offered Plaintiff several non-opioid pain medications, but he declined them all. I continued Plaintiff's morphine at its current dose.
>
> Plaintiff was observed by medical staff walking into the clinic at a fast pace using his walker with no abnormal gait, and was able to sit

---

[1] The court liberally quotes from the affidavits of defendants mostly for clarity as to each defendants' position and as to timeline. The court does not suggest that everything in the affidavits are accepted as true, or that plaintiff agrees with everything stated for purposes of the defendants' motion for summary judgment.

4

> down and stand up with smooth movements. I performed a limited physical examination assisted by a registered nurse at each encounter. Plaintiff also declined to answer questions regarding his function. Plaintiff wanted orthopedic shoes, but he was walking without evidence of abnormal gait or difficulty, had never undergone surgery on his lower extremities, and had no feet deformities on exam. Therefore, in my opinion, there was no medical necessity for orthopedic shoes at that time. Plaintiff did not have severe limitations with respect to his back or hips at that time; was already accommodated with a cane and walker; and was a community ambulator, meaning he was able to navigate the prison using his assistive devices. Therefore, in my opinion, there was no medical need for any additional accommodations at that time.
>
> Plaintiff and I did not discuss the possibility of hip replacement during these initial encounters, the recommendation at that time was for conservative care, and nothing in my examination of Plaintiff suggested to me that Plaintiff required additional treatment.

In paragraph 23 of his second amended complaint, plaintiff asserts that during his first two visits with Dr. Do-Williams, she "noted plaintiff's severe conditions, but did not see to it that I got the attention from a Medical Professional, able to provide me necessary care(s), ADA Reasonable Accommodations, adequate pain medications, or Total Hip Replacement Surgery . . ."

First, plaintiff fails to point to any admissible evidence suggesting Dr. Do-Williams was not a "medical professional" "able to provide necessary care" at plaintiff's initial meetings with her. Any suggestion that plaintiff required attention from a different type of medical professional, and that Dr. Do-Williams was at least deliberately indifferent to plaintiff's medical condition by not seeing to it that plaintiff received such attention is unsupported.

As for "accommodations," plaintiff fails to point to anything suggesting his being denied orthopedic shoes amounts to at least deliberate indifference to a serious medical need, nor point to any specific evidence indicating Dr. Do-Williams denied plaintiff any other accommodation. In his declaration attached to his opposition, plaintiff asserts he has "hammer toes" and orthopedic shoes help with his hip and spine problems. ECF No. 71-3 at 9. Again, these assertions are vague and there is nothing in the record establishing that plaintiff had a serious medical need with respect to his feet, especially since plaintiff was permitted to use a cane and walker which had a seat[2] to take pressure off his feet. Finally, plaintiff fails to point to any expert testimony, or any

---

[2] ECF No. 71-3 at 9.

5

other admissible evidence suggesting Dr. Do-Williams's denial of orthopedic shoes was "medically unacceptable under the circumstances."

Plaintiff fails to point to any evidence suggesting hip replacement surgery was ever denied by Dr. Do-Williams during her initial visits with plaintiff or that it was ever discussed. In his complaint and declaration attached to his opposition to defendants' motion for summary judgment, plaintiff asserts that at various points certain conditions from which he was suffering were clear from his medical records like his need for hip replacement surgery. While plaintiff submits hundreds of pages of exhibits with his opposition to defendants' motion for summary judgment including medical records, he mostly fails to connect particular exhibits which support particular assertions of fact made in his argument opposing summary judgment.[3] Plaintiff's burden to put forward evidence which establishes genuine issues of material fact is not met by simply submitting hundreds of pages of unreferenced exhibits.

Finally, plaintiff takes issue with Dr. Do-Williams not increasing his morphine prescription. First, plaintiff does not point to any expert testimony refuting Dr. Do-Williams's testimony that "opioids are not an appropriate treatment for chronic pain management," and the problems that arise from continued opioid use and opioid tolerance. Further, there is not evidence suggesting the amount of morphine given to plaintiff was "medically unacceptable under the circumstances."

Also, plaintiff does not point to specifics either clear to Dr. Do-Williams from plaintiff's medical records or from information provided to Do-Williams directly from plaintiff which could render the amount of morphine prescribed the product of at least deliberate indifference. In his second amended complaint, and then again in his opposition to defendants' motion for summary judgment, plaintiff asserts numerous allegations of bias, prejudice, torture, collusions, conspiracy,

---

[3] The court dismissed plaintiff's original complaint, in part, because the complaint was too long. The court granted plaintiff leave to amend and instructed plaintiff that his amended complaint could not exceed 20 pages and must not contain repetitive and immaterial information. ECF No. 11 at 2. The court's directives concerning brevity and clarity were ignored by plaintiff in the formulation of his opposition to defendants' motion for summary judgment. Most of the arguments and exhibits put forward are not relevant to or at least not necessary to establishing genuine issues of material fact with respect to plaintiff's remaining claims.

6

malice, retaliations, character assassinations, criminal activity, general ill will, etc., directed toward plaintiff by all of the remaining defendants in this action and others. The problem is plaintiff fails to point to admissible evidence supporting his conclusory allegations which defy logic and the record before the court. The record reflects numerous medical professionals providing plaintiff countless hours of medical attention for various conditions. The record does not suggest defendants were "indifferent," let alone suggest they knowingly subjected plaintiff to cruel and unusual punishment. See Norton v. Dimazana, 122 F.3d 286, 292 (5th Cir. 1997) (deliberate indifference not established when "medical records indicate that [the plaintiff] was afforded extensive medical care by prison officials"). See also Scott v. Harris, 550 U.S. 372, 380 (2007) (summary judgment appropriate when nonmoving party's "version of the events is so utterly discredited by the record that no reasonable juror could believe it").

For these reasons, defendants' motion for summary judgment should be granted with respect to plaintiff's claims concerning his visits with defendant Dr. Do-Williams on July 1 and July 7, 2015.

B. August 2015 through October 2015

In paragraph 24 of his second amended complaint plaintiff alleges that during August, September and October 2015, plaintiff requested from defendants Dr. Do-Williams, Dr. Williams and Saipher medical treatment, accommodations such as use of a wheel chair and an increase of pain medication, but they all refused.

1. Accommodations

In her affidavit, Dr. Do-Williams indicates as follows with respect to accommodations:

> Plaintiff requested a wheelchair from me on September 13, 2015. I did not recommend a wheelchair. On indirect examination, Plaintiff did not have severe mobility limitations of his back or hips and was already accommodated with a cane and walker. Plaintiff was also a community ambulator, and if Plaintiff began to rely on a wheelchair, he would risk permanently lowering his function and perhaps even become wheelchair-bound. Moreover, Plaintiff was considering hip replacement surgery and it was important for him to remain as functional as possible in advance of surgery because outcomes for non-ambulators were considerably worse. Because a wheelchair was not recommended, Plaintiff did not require a wheelchair accessible cell.

In his affidavit, Dr. Williams indicates plaintiff also asked him for a wheelchair on September 23, 2015 and Dr. Williams did not recommend a wheelchair for the same reasons as Dr. Do-Williams.

Finally, in his affidavit, defendant Saipher indicates plaintiff sought a wheelchair from him on October 13, 2015:

> Plaintiff had an appeal pending regarding his previous request for a wheelchair, and I opted to order Plaintiff a wheelchair while he waited for the results of his appeal. However, after ordering Plaintiff his wheelchair, I observed Plaintiff ambulating with his walker using fluid movements and a rapid gait without grimacing, grunting, hesitation, pausing, splinting, or other signs of physical discomfort. This was consistent with several reports from other non-party medical staff around this time period whom observed Plaintiff ambulate using his walker without any issue or signs of discomfort or distress, and indicated that Plaintiff did not have a medical need for a wheelchair at that time. Additionally, when Plaintiff was initially provided a used wheelchair on November 24, 2015, he refused to accept it. It was not until January 27, 2016, when Plaintiff's new wheelchair arrived, that he agreed to accept it.

Plaintiff does not point to any admissible evidence contradicting any of the information provided in defendants' affidavits concerning accommodations provided to plaintiff except that, in his affidavit, he asserts he refused the used wheelchair because it was "broken down." ECF No. 71-3 at 14. Plaintiff does not elaborate further as to what "broken down" means. Instead of using the wheelchair, plaintiff opted to use his walker with a seat. ECF No. 71-3 at 9. Plaintiff fails to point to any admissible evidence in which plaintiff describes how deprivation of any accommodation requested by him between August and October 2015 affected him.

Because there is nothing admissible suggesting the denial of any accommodation, such as a wheelchair, requested by plaintiff between August and October 2015 amounted to deliberate indifference to a serious medical need, defendants' motion for summary judgment should be granted with respect to plaintiff's remaining claims concerning denial of accommodations during that period.

/////
/////
/////

### 2. Increase in Pain Medication

Defendants Dr. Do-Williams, Dr. Williams and Saipher each address, in their own affidavits, plaintiff's allegations that they failed to increase plaintiff's prescription for morphine between August and October 2015:

Dr. Williams

> I had an encounter with Plaintiff on September 23, 2015, and recommended that Plaintiff be tapered off morphine and monitored for signs of missed benefit. I made this recommendation because a non-party doctor had recently increased Plaintiff's morphine from fifteen to thirty milligrams twice a day based on an administrative grievance in which Plaintiff alleged that his pain was preventing him from participating in physical therapy. However, the increase did not improve Plaintiff's function. Instead, Plaintiff requested a wheelchair, which would further lower his function, and sought even more morphine. Additionally, Plaintiff was considering hip replacement surgery and, in my opinion, being on low dose or no morphine would lower the perioperative risks associated with providing anesthesia to a patient on opioids. This would also improve Plaintiff's post operative outcome. Specifically, following surgery Plaintiff would be required to participate in physical therapy and would be provided opioids to manage post operative pain to facilitate that participation. However, if Plaintiff were to have an opioid tolerance because he was receiving high dose morphine, staff could not provide him sufficient opioids to manage his postoperative pain without risking serious complications. I offered Plaintiff several non-opioid pain medications, but he declined. I only made a recommendation to taper Plaintiff off of morphine, I did not decrease his dosage or adjust his prescription in anyway. . .
>
> During July 1 through October 31, 2015, I also encouraged Plaintiff to participate in physical therapy to help maintain his functional status and to prepare him for possible orthopedic surgery. In particular, participating in physical therapy for hip strengthening and gait training in advance of hip replacement surgery will improve surgical outcomes. Plaintiff declined to participate at that time.
>
> I made recommendations and offered treatment to prepare Plaintiff for his potential hip replacement surgery and to increase his chances of a favorable outcome, but was not directly involved in the request or approval process of Plaintiff's procedure from July 1 through October 31, 2015.

Dr. Do-Williams

> Following their September 23, 2015 encounter, the Physical Medicine and Rehabilitation Specialist, Dr. G. Williams, recommended lowering Plaintiff's morphine and monitoring for missed benefit because a recent increase in morphine had not improved Plaintiff's function. Plaintiff was also contemplating hip replacement surgery and Dr. G. Williams recommended being on

9

> low dose or no morphine to lower the perioperative risks associated with providing anesthesia and to improve Plaintiff's post operative outcome. I concurred with Dr. G. Williams' opinion and, consistent with his recommendation, lowered Plaintiff's morphine from thirty milligrams back down to fifteen milligrams twice a day on September 28, 2015, and then tapered him down to fifteen milligrams once a day on October 1, 2015.
>
> During July 1 through October 31, 2015, I also encouraged Plaintiff to participate in physical therapy to help maintain his functional status and to prepare him for possible orthopedic surgery. In particular, participating in physical therapy for hip strengthening and gait training in advance of hip replacement surgery will improve surgical outcomes. Plaintiff declined to participate at that time.
>
> I made recommendations and offered treatment to prepare Plaintiff for his potential hip replacement surgery and to increase his chances of a favorable outcome, but was not directly involved in the request or approval process of Plaintiff's procedure from July 1 through October 31, 2015.
>
> Defendant Saipher
>
> From July 1 through October 31, 2015, I did not recommend increasing Plaintiff's morphine because Plaintiff's medical records demonstrated that higher dose morphine had been ineffective in the past as Plaintiff continued to request ever increasing amounts of morphine. As I explained to Plaintiff during our October 13, 2015 encounter, in my opinion, increasing his morphine would likely serve only to recreate the substance dependence and addiction from which Plaintiff had suffered in the past, while also exposing him to serious side effects.

Much of plaintiff's second amended complaint concerns his dissatisfaction with the amount of morphine prescribed by defendants and others including medical professionals at R.J. Donovan prior to his transfer to CHCF. With respect plaintiff's prescription for morphine from August through October 2015, the court's conclusion is the same as it was with respect to plaintiff's claims concerning his first two visits with Dr. Do-Williams. Plaintiff fails to establish a genuine issue of material fact as to whether any defendant's failure to increase plaintiff's morphine prescription amounted to deliberate indifference. Plaintiff does not point to any expert testimony refuting testimony provided by defendants concerning problems arising from opioid tolerance or suggesting the amount of morphine given to plaintiff at any point was "medically unacceptable under the circumstances." Further, plaintiff again does not point to specifics either clear to any defendant from plaintiff's medical records or from information provided to

defendants directly from plaintiff which could render the amount of morphine prescribed the product of at least deliberate indifference. Defendants and other medical professionals provided plaintiff almost constant medical attention and treatment. While the record shows defendants and others did not always agree with each other concerning the best course of action for plaintiff including how much morphine he should be prescribed, there is nothing suggesting more than a difference of opinion which, by itself, is not deliberate indifference. Toguchi, 391 F.3d at 1058.

C. January 14, 2016 "Cancellation" of Hip Surgery

In paragraph 29 of his second amended complaint, plaintiff alleges that on January 14, 2016, defendants Dr. Do-Williams, Dr. Malakkla and Dr. Adams "stopped plaintiff's previously approved total hip replacement surgery . . . causing plaintiff to further suffer in severe pains over a 2 year period, and counting."

The evidence before the court indicates that Dr. Do-Williams recommended plaintiff for hip replacement surgery on January 12, 1016, but the request for surgery was denied by defendant Malakkla on January 14, 2016. In his affidavit, defendant Saipher provides information concerning care provided to plaintiff with respect to his hips before Dr. Do-Williams made her recommendation:

> Medical personnel at Plaintiff's previous institution recommended conservative care for the degenerative joint disease in his hips. Non-party Dr. Lenoir submitted a physicians request for services on July 27, 2015, requesting an orthopedic consult. The request was approved on July 29, 2015, and Plaintiff was scheduled for a consult on October 7, 2015. Nonparty Dr. Galang of San Joaquin General Hospital performed Plaintiff's orthopedic consult as scheduled. Dr. Galang informed Plaintiff that he "might" require total hip replacement surgery, especially for his left hip, and Plaintiff told Dr. Galang he would think about the procedure and let him know once he decides.
>
> On October 13, 2015, I discussed hip replacement surgery with Plaintiff. Plaintiff wanted to wait until after April 2016 to have his surgery when the weather was warmer, and I informed him that it could take six months to schedule the surgery, so we should start the process. I then submitted a physician request for services, requesting hip replacement surgery. The request was granted by non-party Dr. G. Church. However, records reflect that Plaintiff refused to attend his orthopedic consult on November 25, 2015, so the procedure did not go forward. Attached as Exhibit B is a true copy of Mr. Griffin's appointment history from the Strategic Offender Management System (SOMS), reflecting his November 25, 2015, medical

11

appointment. This entry was made at or near the time of his appointment by prison staff with knowledge, and is kept in the regular course of business CDCR.

Dr. Do-Williams indicates as follows in her affidavit:

> On January 12, 2016, I resubmitted a physician request for services for hip replacement surgery. I indicated that Plaintiff's activities of daily living were unaffected because during our most recent encounter, on January 12, 2016, there was no record of Plaintiff falling and he remained independent with those activities. While Plaintiff had made numerous conflicting statements regarding his independence activities of daily living to various staff in the past, there were no reports from nursing or custody regarding decreased function affecting those activities. There were, however, several reports from medical staff whom observed Plaintiff ambulating with an assistive device without any signs of distress.

In the "physician request for services, referenced by Dr. Do-Williams, she specifically noted that plaintiff has "severe hip [Osteoarthritis]" and is "accommodated with a 4wheel walker." ECF No. 61-4 at 25. She also noted that plaintiff was evaluated by an orthopedic surgeon on October 7, 2015 who recommended surgery. In her report filed after her visit with plaintiff on January 12, 2016, Dr. Do-Williams indicates the visit was initiated by plaintiff "to check up on the date of surgery." ECF No. 61-4 at 24. Finally, Dr. Do-Williams notes in her report that plaintiff refused to attend the November 2015 orthopedic consult referenced by defendant Saipher. Id.

In his affidavit attached to his opposition to defendants' motion to for summary judgment, plaintiff asserts he did not attend the November 2015 orthopedic consult because he was never informed of the appointment. ECF No. 71-3 at 17. However, defendants point to a report indicating he was specifically requested by medical staff to come to the clinic on November 25, 2015 and plaintiff refused. ECF No. 61-8 at 11.

In his affidavit, defendant Dr. Malakkla indicates that at all times relevant he was the Chief Physician at CHCF and his responsibilities included reviewing "Physician's Request for Services (CDC 7243)." "Physicians Request for Services" are approved for medically necessary treatment only. Generally, this means "InterQual" criteria must be met. "InterQual criteria are a library of evidence-based clinical decision support criteria used to assess the medical necessity of a proposed treatment."

The request submitted by Dr. Do-Williams that plaintiff receive hip replacement surgery, ECF No. 61-4 at 25, was denied on January 14, 2016 by Dr. Malakkla because, in the request, Dr. Do-Williams indicated plaintiff suffered no limitations of "ADL," or activities of daily living. This being the case and because "there was no objective evidence within [plaintiff's] medical records to suggest that [plaintiff] was unable to function independently in those activities," InterQual criteria were not met and hip replacement surgery was not medically necessary. On the form in which Dr. Malakkla denied defendant Dr. Do-Williams request, he noted: "If no limitation with ADL, emergency not indicated at this time. Consider when ADL are affected." ECF No. 61-4.

Shortly after Dr. Malakkla denied Dr. Do-Williams's request that plaintiff receive hip replacement surgery, defendant Saipher concluded that the limitation on plaintiff's activities of daily living caused by his hip problems provided a basis for hip replacement surgery:

> On April 14, 2016, I submitted another request for hip replacement surgery, indicating that Plaintiff's activities of daily living were affected. There were no staff reports within Plaintiff's medical records at that time to suggest that he was no longer independent with his activities of daily living. However, Plaintiff had reported that his activities of daily living were affected and I explained in my request that I believed his reports were credible. The procedure was subsequently approved by Dr. Malakkla on April 26, 2016.
>
> During my initial review of Plaintiff's records prior to submission of my April 14, 2016 request, I inadvertently missed Plaintiff's refusal of his orthopedic consult on November 25, 2015. Therefore, I did not know why my October 13, 2015, request had been marked as "refused" when I submitted my subsequent request on April 14, 2016.

In her affidavit, defendant Dr. Adams indicates that in her position as Chief Medical Executive at CHCF, she is responsible for overseeing the medical department and does not see or treat patients. She also indicates she had no involvement in deciding whether plaintiff should have hip replacement surgery. Plaintiff fails to point to any evidence suggesting Adams was involved in any respect in deciding whether plaintiff would be given hip replacement surgery.

It does not appear that any defendant actually "cancelled" surgery. As reflected above, the record before the court indicates that, at worst, approval for hip replacement surgery was delayed by approximately four months because defendant Do-Williams indicated in her January

12, 2016 "physician request for services" that plaintiff's activities of daily living were unaffected. On May 10, 2019, plaintiff informed the court that he would be having "total hip replacement surgery" within a week. ECF No. 86. It is not clear whether plaintiff has had surgery yet.

Plaintiff fails to point to any expert evidence, or otherwise, suggesting Dr. Malakkla's denial of Dr. Do-Williams's request that plaintiff receive hip replacement surgery amounts to deliberate indifference. Dr. Malakkla indicated he denied the request because "InterQual" criteria were not met. Nothing suggests this was "medically unacceptable under the circumstances" especially since: (1) Dr. Malakkla indicated he would reassess if it were determined that plaintiff's activities of daily living were affected; and (2) when defendant Saipher indicated that she felt that was the case Dr. Malakkla granted her request that plaintiff be provided hip replacement surgery.

While Dr. Do-Williams may have caused a delay in hip replacement surgery by indicating plaintiff had no limitations of "ADL," there is nothing before the court suggesting this was done with the intent that plaintiff be denied or delayed surgery or knowledge that it would. Nothing suggests she was aware or should have been aware defendant Dr. Malakkla would base his decision to deny surgery solely on defendant Dr. Do-Williams's indication that plaintiff had no limitations of "ADL." Also, Dr. Do-Williams went to the trouble of seeking surgery for plaintiff, indicated in her request that plaintiff had been using a walker, was suffering from "severe" osteoarthritis and had previously been recommended for surgery. There is nothing in the record suggesting this was all subterfuge.

For all the foregoing reasons, defendants are entitled to summary judgment with respect to all claims arising from plaintiff being denied hip replacement surgery on January 14, 2016.

IV. Motion to Strike

Plaintiff includes approximately 450 pages of exhibits with his opposition to defendants' motion for summary judgment. On February 4, 2019, about a month after plaintiff submitted his opposition, he submitted 176 more pages of exhibits along with a letter in which plaintiff attempts to explain the late filing. Defendants' move to strike the second round of exhibits as late and

////

14

duplicative of exhibits previously submitted.[4]  A review of the court's docket reveals that the 176 pages of exhibits were included in the 450 pages of exhibits previously submitted.  Accordingly, the documents filed February 4, 2019 will be stricken.

In accordance with the above, IT IS HEREBY ORDERED that:

1. Defendants' February 7, 2019 motion to strike (ECF No. 77) is granted; and

2. The exhibits submitted by plaintiff on February 4, 2019 are stricken.

IT IS HEREBY RECOMMENDED that:

1. Defendants' motion for summary judgment (ECF No. 61) be granted; and

2. This case be closed.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be served and filed within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

Dated:  August 22, 2019

_____
CAROLYN K. DELANEY
UNITED STATES MAGISTRATE JUDGE

1
grif1435.msj

---

[4] The 176 pages of exhibits submitted by plaintiff on February 4, 2019 are not in the same order as the copies of those exhibits attached to plaintiff's opposition.  The court appreciates counsel for defendants identifying those portions of the original exhibits which are duplicative of the exhibits submitted February 4, 2019.

15